IN RE ESTATE OF MABEL E. POTTHOFF, DECEASED.
JANE DEWEY ET AL., APPELLEES,
V. LLOYD POTTHOFF, APPELLANT.
573 N.W. 2d 793

Filed January 20, 1998.   No. A-96-1306.

Terry L. Rogers, of Terry L. Rogers Law Firm, P.C., and Steven W. Hirsch, of Hirsch & Pratt, L.L.P., for appellant.

Stanley C. Goodwin for appellees Jane Dewey, Katherine Potthoff, and Susan Prentice.

SIEVERS, MUES, and INBODY, Judges.

MUES, Judge.

## INTRODUCTION

This appeal seeks the reversal of the decision of a county court which imposed equitable remedies based upon a finding that fiduciary duties had been breached by the appellant, Lloyd Potthoff, in his borrowing of money from his mother, and that the promissory notes did not reflect the parties' true intentions.

## FACTS

On May 21, 1990, Mabel E. Potthoff executed a durable power of attorney appointing her son, Lloyd Potthoff, her attorney in fact. Lloyd testified that prior to this time, his brother,

Wayne Potthoff, had been given Mabel's power of attorney until Wayne's death in 1989.

From August 3, 1990, until her death in 1995, Mabel made 15 separate loans to Lloyd totaling $241,408.84. For each loan, Lloyd issued Mabel a promissory note using a standard "fill in the blank" form. The first three promissory notes carried a 10½-percent annual interest rate and were due 1 year from the date of issue. All the subsequent promissory notes carried a 6½-percent interest rate and, with the exception of two notes, were due 5 years from the date of issue. Lloyd testified that on one of the two promissory notes he inadvertently put the date the note was issued, September 29, 1993, as the due date rather than September 29, 1998, the date the note was supposed to be due.

On August 10, 1992, the initial four notes were combined into one note with an interest rate of 6½ percent. At this time, two of the notes were approximately a year overdue, the third note was a week overdue, and the fourth note was not due for several more years. Lloyd testified that when he issued the replacement promissory note, he miscalculated the total amount due and made it out for $1,000 greater than the combined total of the amounts due under the four replaced notes. Thus, the total amount owing on the 12 promissory notes outstanding at Mabel's death was $242,408.84, plus interest.

When questioned why notes which had been issued at 10½ percent were reissued at 6½ percent, Lloyd testified that Mabel had received notice that the interest rate on her "NOW account" would be changing from 6 percent to 1.8 percent so they renegotiated the notes and "made a deal so that we was paying the interest." Lloyd further testified:

A- So this is why we started negotiating and I said well, I'll pay you 6 1/2. I can use it. And she said will I get repaid? And I said, yes, I said I got the land in the estate and I thought — Gonna sell the land and pay ya off.

Q- Sell what land?

A- Her land. To pay off the notes that I have — Of the estate.

Q- So you promised her that you would sell the land that was in her estate to pay off these notes?

A- I promised to try to sell it and I have done that.

Prior to her death, Mabel amended her will and specifically devised certain real property to Lloyd and other real property to Wayne's issue. The remainder of the property was to be divided between Lloyd and Wayne's issue.

On August 25, 1996, the personal representative filed an amended motion seeking to set aside the promissory notes. The personal representative alleged, inter alia, that the notes were not negotiated at arm's length and that the terms of the notes were egregious and were the result of undue influence by Lloyd. The motion prayed that the court order the notes immediately due and payable and requested that if Lloyd did not immediately repay the notes, the land devised to him be sold to offset the debt.

At the November 22, 1996, hearing, the county court declared that based on the foregoing testimony of Lloyd, he and Mabel had anticipated that the loans would be paid off from the land Lloyd inherited upon Mabel's death and further that they intended that the loans be paid off on demand. In the county court's order, the court found that Lloyd had breached his fiduciary duty to Mabel but found no evidence of undue influence. The court held that the notes were immediately due and payable, with the indebtedness to constitute a lien on the real estate devised to Lloyd.

## ASSIGNMENTS OF ERROR

Restated, Lloyd alleges the county court erred in accelerating the due dates of the notes and imposing a lien on the real estate and in failing to reform one of the promissory notes to reflect the intended due date.

## STANDARD OF REVIEW

An appellate court reviews probate cases for error appearing on the record made in the county court. *In re Estate of West*, 252 Neb. 166, 560 N.W.2d 810 (1997); *In re Estate of Disney*, 250 Neb. 703, 550 N.W.2d 919 (1996).

In an equitable proceeding, an appellate court makes an independent determination of both the facts and the applicable law. *In re Estate of West, supra.*

## DISCUSSION

*Due Dates of Notes.*

In Lloyd's first assignment of error, he alleges the county court erred in accelerating the promissory notes, because the court found there was no evidence of undue influence and there was no evidence of mutual mistake or of a unilateral mistake caused by Lloyd's fraudulent or inequitable conduct.

At the hearing on the motion to set aside the promissory notes, the court declared that "the transaction anticipated that the [promissory] notes would be repaid and that the farm was security for the notes." The court further found that "it was the intention of the parties that [the promissory notes] be paid off on demand. So, I'm going to find that those notes should be accelerated and declare that those notes are due and owing . . . ."

> Generally, provided other requisites for equitable juris-
> diction exist, an instrument may be canceled on the
> ground of a mistake of fact. More particularly, where par-
> ties have apparently entered into a contract evidenced by a
> writing, but owing to a mistake their minds did not meet as
> to all the essential elements of the transaction, so that no
> real contract was made by them, then a court of equitable
> jurisdiction will interpose to rescind and cancel the appar-
> ent contract as written, and to restore the parties to their
> former positions. . . .
>
> Furthermore, equity will grant relief on the ground of
> mistake, not only when the mistake is expressly proved,
> but also when it is implied from the nature of the transac-
> tion. It is not essential that either party should have been
> guilty of fraud.

12A C.J.S. *Cancellation of Inst.* § 40 at 706 (1980). See, also, *Eliker v. Chief Indus.*, 243 Neb. 275, 278, 498 N.W.2d 564, 566 (1993) (observing, "[g]rounds for cancellation or rescission of a contract include, inter alia, fraud, duress, unilateral or mutual mistake . . .").

> "Reformation is based on the premise that the parties
> had reached an agreement concerning an instrument, but
> while reducing their agreement to a written form, and as
> the result of mutual mistake or fraud, some provision or
> language was omitted from, inserted, or incorrectly stated

in the instrument intended to be an expression of the actual agreement of the parties."
*Jelsma v. Acceptance Ins. Co.*, 233 Neb. 556, 559, 446 N.W.2d 725, 727 (1989).

At the September 27, 1996, hearing on the motion to set aside the promissory notes, Lloyd gave the following testimony:

A- . . . And she said will I get repaid? And I said, yes, I said I got the land in the estate and I thought — Gonna sell the land and pay ya off.

Q- Sell what land?

A- Her land. To pay off the notes that I have — Of the estate.

Q- So you promised her that you would sell the land that was in her estate to pay off these notes?

A- I promised to try to sell it and I have done that.

Q- Okay. So, at the time you were negotiating these notes you were talking about trying to sell your share of the land to pay the notes. Is that correct?

A- Yes.

Q- All right.

A- She knew that I intended to pay it off and in — That I would sell other land and I — As you know you made out a sales contract . . . last year and this was to pay off some notes, too. But it — As you know that contract didn't — Fell through.

Q- So you're saying that you tried to sell the land that was in the estate last year to pay these notes?

A- Yes.

Q- And that deal fell through.

A- Yes.

On appeal, Lloyd argues that although the parties discussed using the devised land to repay the loans after Mabel's death, there is no evidence that the parties intended to include these terms in their contract. We have a little difficulty distinguishing the two concepts. Lloyd and Mabel obviously discussed it, and they obviously did not put it in the notes. When and how repayment would occur were both essential terms of these loans. As Lloyd's testimony indicates, Mabel was clearly concerned that Lloyd would be unable to repay the money if she loaned it to

him. Lloyd had filed for chapter 12 bankruptcy in 1987, which was not dismissed until sometime in 1991 or 1992. At the second hearing on the motion to set aside the promissory notes, the following testimony was had:

Q- . . . So, at the time these loans would've been made to you, you wouldn't have had a whole lot of net worth at — During the period of time - - -

A- No.

Q- - - - you were borrowing the money from your mother? Okay. So, it wouldn't be based upon any security you had but it was based upon your expected inheritance of your mother's estate that she was loaning you money?

A- That's — When we had our conversation, she says, "How are you going to repay these?" And I said, "Well, you can sell the land or work it out somehow like that." I — *She wouldn't have made the loan if she wouldn't have thought that.*

Q- All right. She wouldn't have made the loan if she didn't think you was gonna repay it?

A- That's right.

(Emphasis supplied.)

Our de novo review of Lloyd's testimony leads us to conclude that the parties intended that the devised land would be sold to pay the loans if they were not repaid before Mabel's death. Mabel's death triggered the devise and thus the due date of the outstanding debts which were to then be paid by sale of such devised land. Lloyd's actions following Mabel's death are consistent with that intent, as he testified that subsequent to Mabel's death he attempted to sell the land to repay the debt "but the other heirs refused to go along with it."

For the foregoing reasons, we find that due to a mistake of fact the parties' "minds did not meet as to all the essential elements in the transaction" or due to a mutual mistake the promissory notes omitted a portion of their agreement. In the latter instance, reformation exists as an equitable remedy to enforce the agreement actually made (due date of the notes being Mabel's death rather than the specific due dates on the notes) and in the former instance, cancellation stands ready to restore

the parties to precontract status for failure of the minds to meet on an essential element (due date of the notes). Under either theory, the result is the same. The moneys loaned are now due and owing. A finding of no undue influence does not preclude either remedy, nor does either depend upon a finding of fraud or inequitable conduct on Lloyd's part.

As Lloyd argues, the county court's order was expressly premised upon a breach of a fiduciary duty by Lloyd. The nature of that duty and the facts supporting its breach are not fully explained in the order. The evidence is that the loans were made by Mabel to Lloyd, not by Lloyd, as attorney in fact, to himself. There is no evidence that Mabel loaned the money without full knowledge of what she was doing. There is no allegation of fraud on Lloyd's part or mental incapacity of Mabel, and the county court's finding that there was no undue influence exerted on Mabel goes unchallenged by the estate on this appeal. Accordingly, we have grave doubts that Lloyd breached any fiduciary duty as a result of these transactions. However, it is unnecessary for us to decide this issue, because in the final analysis, and no matter what words were chosen by the county court, it is apparent that the county court was convinced that Lloyd should be held to the promise that he made to his mother as part of her loaning him this money. The order accomplished that end, equitable principles and the evidence support the result, and Lloyd does not challenge the relief granted as being beyond the pleadings or the county court's equitable powers. Where the record adequately demonstrates that the decision of a trial court is correct, although such correctness is based on a ground or reason different from that assigned by the trial court, an appellate court will affirm. *State v. Allen*, 252 Neb. 187, 560 N.W.2d 829 (1997).

Because our de novo review convinces us that the notes were properly reformed or canceled, we need not address Lloyd's other assignments of error regarding the result reached by the county court. See *Kelly v. Kelly*, 246 Neb. 55, 516 N.W.2d 612 (1994).

*Imposition of Lien.*

To the extent Lloyd's assignments of error can be construed as separately challenging the county court's imposition of a lien

on his devised lands as security for repayment of the indebtedness found due and owing, we believe Neb. Rev. Stat. § 30-24,101 (Reissue 1995) offers guidance. It provides, in pertinent part, that "the amount of a noncontingent indebtedness of a successor to the estate . . . shall be offset against the successor's interest . . . ." The indebtedness here is noncontingent, it is due and payable, and Lloyd clearly has an interest in the estate.

While it might be argued that an order declaring that a successor's (Lloyd's) indebtedness shall constitute a *lien* on that successor's interest in the estate goes beyond simply *offsetting* the noncontingent indebtedness against his interest in the estate, any such distinction has little practical effect in this case. Lloyd is devised certain lands in Mabel's will, and he owes her estate a certain sum of money. We believe § 30-24,101 carries with it the authority of the county court to enter those orders necessary to carry it into effect. By definition, an offset is accomplished by a contemporaneous balancing of the successor's indebtedness against his or her credits or interests in the estate. See Webster's Encyclopedic Unabridged Dictionary 1001 (1989) (defining "offset" as "to counterbalance," "*to offset debits against credits*"). We believe the imposition of a lien was a reasonable method for the county court to ensure accomplishment of the offset mandated by § 30-24,101. Thus, that aspect of the order is also affirmed.

## CONCLUSION

The county court correctly ordered the outstanding balance of the promissory notes as due and payable to the estate, with the indebtedness to constitute a lien on Lloyd's interest in the estate, the real estate devised to him by Mabel's will. We therefore affirm the county court's order accordingly.

AFFIRMED.